# Steve Zissou & Associates
## Attorneys at Law
42-40 Bell Boulevard, Suite 302
Bayside, New York 11361

Office   (718) 279-4500                                    Email: stevezissou@verizon.net
Facsimile (718) 281-0850

June 27, 2011

Honorable Sandra L. Townes
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:   *United States v. Bombino, et al.*
               10 Cr 147 (SLT)

Dear Judge Townes:

This letter is respectfully submitted on behalf of Edward Garofalo joining the motion for a separate trial filed by co-defendant, Alicia Dimichele.

## Argument

A.   Garofalo's Supplemental Affidavit Establishes That Fundamental Fairness In The Administration of Justice Demands That Ms. Dimichele Should Be Severed For Trial From Her Co-defendants To Avoid Substantial Prejudice

In the government's memorandum in opposition to Ms. Dimichele's supplemental motion for a separate trial, the attorney for the government advanced three grounds upon which the motion should be denied:

1.   That Dimichele Has Not Conclusively Shown That Garofalo Would Waive His Fifth Amendment Privilege And Testify At A Severed Trial;

2.   That Garofalo's Purportedly Exculpatory Testimony Is Conclusory And Would Be Cumulative;

3.   And that Garofalo's Purported Testimony Would Be Subject To Substantial, Damaging Impeachment.

For the reasons set forth below, all of the grounds advanced by the government are without substantial merit and should be rejected.

## I.   Garofalo's Agreement to Testify at a Separate Trial is Unconditional

Submitted along with this letter is a supplemental affidavit signed by Mr. Garofalo in support of his wife, Alicia Dimichele's supplemental motion for a separate trial. In paragraph 11 of his affidavit, he makes it abundantly clear that his agreement to testify on behalf of his wife is *unconditional*. I have addressed this with Mr. Garofalo and he understands that this means his testimony may come before or after his own charges are resolved and he is prepared to do so.

Accordingly, it is now pellucidly clear that Dimichele has conclusively shown that Garofalo would unconditionally waive his Fifth Amendment privilege and testify at a severed trial. Thus, the first *Finkelstein* factor has been satisfied.

## II.   Garofalo's Expected Testimony Is Not Cumulative

The next ground advanced by the government, that Garofalo's testimony is *cumulative,* is not only without merit, it is inaccurate and misleading.

Putting aside, for the moment, the rather incredible notion advanced by the government that cooperating witness, Stephen Marcus, would be an adequate substitute for Edward Garofalo, because he (Marcus) "will be subject to cross-examination by Dimichele," the government has advanced the even more incredible notion that Garofalo's dispatcher Anthony O'Donnell ("Tony O") is also a suitable *available* substitute for Mr. Garofalo. Simply put, this contention makes no sense.

Mysteriously omitted from the government's memorandum in opposition is the fact that O'Donnell is currently under indictment (*USA v. Dragonetti, et al,* 11-cr-03-DLI) and is being prosecuted by the same United States Attorney's Office that is prosecuting Garofalo and Dimichele. O'Donnell's charges include membership in the *"Gambino"* crime family, RICO conspiracy and extortion. It is inconceivable that the *"Persico"* prosecution team actually *does not know* that O'Donnell is under indictment and represented by counsel. Nor is it conceivable that it is not known that O'Donnell's case is currently pending before the Honorable Dora L. Irizarry, or that his case is being heard *on the same floor* of the same courthouse as Ms. Dimichele's.

Regardless of the government's motives in making such a feeble argument, since O'Donnell is currently under indictment and represented by counsel, the likelihood that he would ever agree to waive his right to remain silent and testify on Dimichele's behalf (as a so-called substitute for Mr. Garofalo) is virtually nil. And for the reasons set forth below, even if O'Donnell's testimony could somehow be secured on behalf of Ms. Dimichele, it would not be a suitable replacement for the testimony of Mr. Garofalo because he cannot provide the type of detailed testimony that Garofalo can provide. Furthermore, in the unlikely event that O'Donnell did agree to testify for Ms. Dimichele, he would be subject to at least as much, if not more impeachment as Mr. Garofalo, a circumstance that the government argues as a basis for denying the instant motion. In short, the government's argument that O'Donnell would be a suitable substitute for Mr. Garofalo is internally contradictory and completely meritless.

Finally, the government has suggested that there are other potential witness including "other employees of the trucking companies. . . . professionals, vendors, clients and Local 282 officials with whom she (Ms. Dimichele) regularly communicated on behalf of the trucking companies" who can testify on her behalf. But as will be evident after the remarks that follow, none of those unidentified individuals would qualify as viable substitutes for Mr. Garofalo who can and will provide detailed *exculpatory* testimony regarding the core allegations against Ms. Dimichele.

## III.  Garofalo's Supplemental Affidavit Is Neither Conclusory Nor Cumulative

Assuming *arguendo* the government's assertion that Garofalo's initial affidavit in support of his wife's motion for a separate trial is inadequate to obtain the relief requested, his supplemental affidavit makes it clear how crucial his testimony will be for Ms. Dimichele.  The examples cited on pages 17 and 18 of the government's memorandum in opposition prove just how important Garofalo's testimony will be to ensure that Ms. Dimichele is accorded her due process right to a fair trial.

For example, according to the government, recorded conversations *"prove that Dimichele was aware of the double-breasting scheme,"* and "*contradict Garofalo's proffered testimony."* However, as Mr. Garofalo makes clear in his supplemental affidavit, the government misreads or over reads the secretly recorded conversations.  For example, according to the government, a conversation between Alicia Dimichele and Teddy Persico recorded on November 19, 2004 about *"cash payroll for the guys"* (gov. memo at p. 17), proves that she (Dimichele) was aware of the alleged scheme that is charged in the indictment.

In fact, as Mr. Garofalo makes clear in his supplemental affidavit, the above-referenced conversation actually referred to cash payments made to *non-union employees* such as mechanics, washers and maintenance workers, not union drivers. Thus, his testimony, and only his testimony regarding these allegedly incriminating conversations is the only way that Dimichele can refute the government's suggestion that this conversation proves that she knew about the scheme charged in the indictment.

The government makes the same mistake with  regard to another conversation recorded on December 1, 2004.  On page 17 of the government's memorandum in opposition, the prosecutor claims as follows:

> [I]n a conversation intercepted on December 1, 2004, Dimichele explained to Garofalo how she had arranged the bank accounts for two of the trucking companies at that same bank, then reassured Garofalo that "everything" would be done through the union company. Dimichele's report to Garofalo shows that she was aware of, and participated in the agreement to, use multiple bank accounts at multiple companies to conceal revenue from Local 282 – the main object of the charged embezzlement scheme.

However, as Mr. Garofalo again makes unequivocally clear in his supplemental affidavit, the circumstances surrounding the above-mentioned conversation fall far short of proving what the government has suggested.  Instead, as Mr. Garofalo would explain in his testimony, this conversation referred to a completely innocent event that occurred prior to the recording in question.  In fact, when he was running the trucking company, Garofalo had been using accounts held at Fleet Bank. Prior to the recorded conversation cited by the government, Fleet Bank was purchased by Bank of America.  Following the merger, there were fewer branches so, as he explains in his affidavit, he decided to move their bank accounts to Commerce Bank.   After this decision was made, Garofalo would testify that he, and he alone, met with the Commerce Bank official and explained the banking needs of the trucking company. His wife, Alicia Dimichele, was not present for this meeting.   Among other things, Garofalo would testify that he "explained to the bank official the nature of my trucking business and described the number and types of accounts that we needed."  He would also testify that he "told the bank official that my primary company was 'DM' trucking and that most of the business would run through the DM accounts since this business by far brought in the most gross revenues."

In his supplementary affidavit, Garofalo explains what actually occurred:

> Following this meeting (with the bank official), Alicia went to the bank to complete the process.  This included completing the necessary documents so that she could be a signatory for the DM accounts.  During the recorded conversation, she was simply repeating the instructions that I had given to the bank official who had, in turn, repeated them to her during her visit to the bank to complete the signature cards.

Contrary to the government's characterization of the recorded conversation cited in the memorandum in opposition, this conversation does not establish that Dimichele was aware of the double breasting conspiracy that is charged in the indictment.

1.    Severance Is Necessary When Needed To Allow A Defendant To Present Exculpatory Evidence

Because joint trials for those indicted together are preferred, "when defendants properly have been joined under Rule 8(a), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). This risk of prejudice includes circumstances where "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial."  *Id.*, citing *Tifford v. Wainwright*, 588 F.2d 954 (5th Cir. 1979).

In *Tifford*, the Supreme Court approved of severance when a joint trial renders unavailable exculpatory evidence that would be available in a severed

trial. Tifford had contended that his co-defendants would testify on his behalf if the motion were granted. His submission to the lower court included a co-defendant's affidavit to the effect that the co-defendant would testify to Tifford's lack of knowledge of the crimes that were charged.  Such testimony concerned matters that were "central to the crimes charged by the indictment, and the co-defendant's testimony was essential to rebut the prosecution's proof on this crucial issue." *Id.* This record conclusively established prejudice, and the failure to sever made the joint trial "fundamentally unfair." *Id.*

A four-factor test for evaluating requests for severance based on the need for exculpatory evidence was announced by the Second Circuit in *United States v. Finkelstein*, 526 F.2d 517 (2d Cir. 1975).  In reviewing a trial court's decision on severance, the Second Circuit in *Finkelstein* was satisfied that the trial court could properly have considered: (1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the countervailing consideration of judicial economy; and (4) the likelihood of strong impeachment of the exculpatory testimony. *Id.* at 524. The *Finkelstein* factors remain guideposts for district court evaluations of applications for severance in this Circuit. See, e.g., *United States v. Morelli*, 2005 WL 743062 (S.D.N.Y) (2005) (applying *Finkelstein* factors and granting severance).

## Conclusion

Given the detailed information provided in Garofalo's supplementary affidavit, it is readily apparent that the *Finkelstein* factors strongly support the motion for a severance. Without a severance, Ms. Dimichele will be severely hamstrung and prejudiced in presenting testimony vital to her defense on central issues at her trial. Not only do the *Finkelstein* factors strongly favor severance, but Ms. Dimichele has clearly carried her burden under *Zafiro* by demonstrating that joinder would severely prejudice her by preventing her from offering crucial testimonial evidence that is not available from any other source and that, if believed, would constitute a complete defense to the central charges in the government's case against her.  Under the circumstances, severance is surely warranted.

Thank you for your consideration in this matter.

Respectfully submitted,

Steve Zissou

Steve Zissou
Attorney for Edward Garofalo

cc: all parties, by ecf (w/o attachment)